**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| FRANK POESCHEL,<br><br>Plaintiff,<br><br>v.<br><br>SLWM, LLC, d/b/a SUPPLYLOGIC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:26-cv-00359-RK |

**ORDER**

Before the Court is Plaintiff Frank Poeschel's motion for preliminary injunction. (Doc. 6.) The motion is fully briefed, (Docs. 7, 10, 23, 26-1),[1] and the Court held a preliminary injunction and evidentiary hearing on July 17, 2026, (Docs. 36, 37). The parties additionally submitted closing briefs as requested by the Court at the conclusion of the hearing. (Docs. 39, 40.) After careful consideration and for the reasons explained below, Plaintiff's motion for preliminary injunction is **DENIED**.

**Background and Procedural Posture**

This case arises from Plaintiff Frank Poeschel's (now-former) employment with Defendant SLWM, LLC, as a promotional products salesperson. Plaintiff has worked as a promotional products salesperson for 39 years. (Doc. 8 at ¶ 4.) He began his career in the industry in 1987 with Wallace Computer Services. (*Id.* at ¶ 6.) In 1996, he co-founded and served as President for Resource Print Management. (*Id.*) Resource Print Management's customers included ACE (Populus), La Quinta, VisionWorks, Williamson-Dickie, Pier 1 Imports, D.R. Horton, Payless Power, James Hardie, Warrantech, and Johns Manville. (*Id.*) In December 2009, Resource Print Management merged with Webb-Mason, Inc. (*Id.* at ¶ 7.) Plaintiff continued his employment with Webb-Mason, Inc., in a dual sales and managerial capacity,[2] and Plaintiff obtained an ownership

[1] Defendant SLWM, LLC, filed a motion for leave to file sur-reply, (Doc. 26), which the Court granted, (Doc. 30).

[2] "Q. . . . [B]efore [SLWM] took over management, you were involved in all aspects of the sales process, researching prospects, winning the business, and managing the business, correct?" "A. Correct. That is correct." (Doc. 37 at 30:5-9.)

interest in Webb-Mason, Inc. (*See* Doc. 37 at 31:13-17.) The aforementioned customers of Resource Print Management followed Plaintiff to Webb-Mason. (*Id.* at ¶ 7.)

Then, in December 2022, SLWM, LLC, *d/b/a* SupplyLogic, acquired Webb-Mason, Inc. (*Id.* at ¶ 8.) As part of this transaction, Webb-Mason sold to SLWM its client book and relationships and, as the surviving entity, SLWM is the successor to all of the predecessor companies' contracts and all rights under those contracts. (Doc. 11 at ¶ 3.) A substantial portion of the consideration paid in the 2022 acquisition was attributable to the customer book of business of the acquired companies, which included those companies which had initially followed Plaintiff from Resource Print Management to Webb-Mason. (*Id.* at ¶ 4.) Because of his ownership interest in Webb-Mason, SLWM's acquisition of the promotional products company included compensation to Plaintiff. (Doc. 37 at 31:18-21.) Initially, Plaintiff continued his employment with SLWM in a dual role where Plaintiff worked in both sales and managerial capacities. (Doc. 8 at ¶ 9.) In 2023, however, his role changed to more of just a salesperson capacity, and he was compensated only on his assigned client accounts. (*Id.* at ¶ 10.)

In June 2024, SLWM presented Plaintiff with an employment agreement, titled "Senior Account Executive (SAE) Commission Plan – Effective 7/1/24" ("2024 Agreement"). (Doc. 8-1 at 3.) The 2024 Agreement changed Plaintiff's title to Senior Account Executive and provided that his commissions would be paid based on the "Senior Account Executive Plan." (*Id.* at 2.) It included an Exhibit A, titled "Commission Rates," referred to internally at SLWM as the "A Plan." The A Plan applies to employees whose earnings consist entirely of earned commissions. The 2024 Agreement also included an Exhibit B, titled "Commission Rates," which provided the compensation structure to salaried employees who also earned commissions. (*Id.*; Doc. 8 at ¶ 15.)

The 2024 Agreement reserved SLWM's "right to modify the commission plan at its discretion, with reasonable notice to the sales team." (Doc. 8-1 at 4.) The 2024 Agreement does not include any non-competition or non-solicitation provisions. Plaintiff signed the 2024 Agreement on October 1, 2024. (Doc. 8-1 at 2.) Plaintiff did not earn a base salary in the Senior Account Executive role. Thus, Plaintiff's commissions were calculated and paid based on the A Plan as of October 1, 2024. (Doc. 8 at ¶ 15.)

In January 2025, SLWM presented Plaintiff with another employment agreement titled "Employee Confidentiality, Non-Competition, Non-Solicitation and Assignment of Work Product

Agreement" ("2025 Agreement"). (Doc. 8-3.) The first paragraph of the 2025 Agreement sets forth the consideration for the Agreement as follows:

> (i) my employment by SLWM, LLC . . . (ii) exposure to the Company's Confidential Information, proprietary business methods, and protectable assets and relationships including the Company's new and existing customers, and (iii) any monies or other remuneration provided beyond my base compensation; the receipt and sufficiency of which are hereby acknowledged . . . .

(*Id.* at 2.)

Most relevant here, the 2025 Agreement contains non-competition and non-solicitation provisions, as follows:

> **2. <u>Non-Competition and Non-Solicitation.</u>**
>
> (a) During the restricted period, I shall not, directly or indirectly, for my benefit or the benefit of any third party, in any capacity, enter into, conduct, operate, engage in or assist others to engage in, consult[,] manage, perform services for or otherwise participate as proprietor, owner, lender, officer, director, manager, member, employee, agent, independent contractor, vendor, consultant, advisor, joint venturer, licensee, principal, partner or otherwise *in any business with current customers of the Company or customers who have done business with the Company in the twelve (12) months prior* to the Non-Compete Restricted Period, including without limitation providing marketing solutions in the print, branded merchandise, and apparel categories within the Restricted Territory[.]
>
> (b) In order to protect the Company's confidential or trade secret business information and its customer and supplier relationships, goodwill and loyalty, I agree that, during the Restricted Period, I shall not, directly or indirectly, for my benefit or the benefit of any third party, in any capacity: . . . (ii) call-on, induce, or solicit, or attempt to call-on, induce, or solicit, any present or prospective customers, suppliers or other business relations of the Company *to terminate, adversely modify, or reduce their relationship with the Company* . . . .

(*Id.* at 3-4, § 2(a)-(b) (emphasis added).) The "Restricted Territory" means "the United States." (*Id.* at 4, § 2(c).) The "Restricted Period" covers the term of employment and

> a period of twenty-four (24) months following the date of my termination of employment from the Company, unless a court of competent jurisdiction determines the twenty-four month duration to be unenforceable, in which case the duration shall be the longest of the following: (x) the date determined by a court of competent jurisdiction to be enforceable under applicable law, or (y) eighteen (18) months, or (z) twelve (12) months, in each case from and after the date of my termination of employment from the Company.

(*Id.* at 4, § 2(d).) The 2025 Agreement further states that "[a]ny subsequent change or changes in the terms and conditions of my relationship with the Company, including, but not limited to, my duties or compensation, will not affect the validity or scope of this Agreement." (*Id.* at 7, § 9.)

The 2025 Agreement contains no commission tables or provisions regarding the calculation of commissions.

Plaintiff did not immediately sign the 2025 Agreement. On January 15 and 16, 2026, Plaintiff attended a sales meeting in Fort Lauderdale, Florida, at which SLWM's then-CEO Kevin Sherlock and President Michael Marchetti urged the sales representatives to sign the 2025 Agreement and orally represented that it did not impact compensation. (Doc. 8 at ¶ 19.) In late January or early February, Eric Kerstetter—SLWM's Chief Revenue Officer and sales team manager—told Plaintiff and the sales team that the only difference in the 2025 Agreement and the prior restrictive-covenant agreement was that it was governed by Missouri law rather than Delaware law, and that pay and commissions would remain the same. (*Id.* at ¶ 22.) Plaintiff attests that between February 2025 and April 2025 SLWM's management, including Mr. Marchetti, Mr. Sherlock, and Mr. Kerstetter, texted, called, and emailed him and tried to convince him to sign the 2025 Agreement. (*Id.* at ¶ 23.) During these communications, Plaintiff attests that he asked about compensation multiple times and was assured that he would continue to be paid on the A Plan. (*Id.*)

Plaintiff signed the 2025 Agreement on April 10, 2025, but did not immediately return the signed agreement to SWLM. (*Id.* at ¶ 26.) Instead, the next day, on April 11, 2025, Plaintiff emailed Mr. Sherlock: "I am having trouble printing this [o]ut, but I am good with the Agreement. As soon as I get this printed out, I'll sign and send over. Also, can you confirm there is a separate Commission agreement coming and that all accounts pay on the A plan." (Doc. 8-2 at 2.) Mr. Sherlock responded: "Confirmed." (*Id.*) Plaintiff then returned the signed 2025 Agreement to SLWM on April 14, 2025. (Doc. 8 at ¶ 28.)

Less than two weeks later, on April 21, 2025, SLWM announced that it was implementing a new commission plan, with a backdated effective date of March 1, 2025 ("2025 Commission Plan"). (Doc. 8-5.) The 2025 Commission Plan included an Exhibit A, titled "Commission Scale." (*Id.* at 5-6.) The 2025 Commission Plan retired the "Plan B" or "B Plan" structure (which appeared in Exhibit B to the 2024 Agreement) and adopted a commission structure "based on a percentage of the overall gross profit [] generated from the sales of marketing services." (*Id.* at 2.) In other words, the 2025 Commission Plan structure eliminated the compensation plan for salary +

commission salespersons.[3] Plaintiff attests that the 2025 Commission Plan reduced his earned commissions by approximately 40% compared to what he would have earned under the 2024 Agreement's A Plan. (Doc. 8 at ¶ 33.) The 2025 Commission Plan was implemented unilaterally by SLWM; Plaintiff did not have the opportunity to negotiate it and was not asked to sign it, instead it was merely presented to the salespeople as the applicable commission plan. (*Id.* at 35; Doc. 37 at Tr. 64:2-6.)

The same day that SLWM announced the 2025 Commission Plan, Plaintiff emailed Mr. Kerstetter raising concerns about the new commission plan:

> Eric,
>
> See attached email from Kevin. I asked and Kevin confirmed we would be paid on the A Plan. He and no one else ever said the pay plan would change, but you homogenized the A and B plan. Then, you give us the commission plan after we sign our agreement. Really?
>
> By this plan, I get paid 1% on James Hardie's 6mm in sales at 24%. The company gets 1.44mm in margin and I get paid 14,400.
>
> Frank Poeschel

(Doc. 8-4 at 2.) Then, on October 20, 2025, Plaintiff followed up with Mr. Sherlock about his compensation and its projected decline for 2025 compared to past years. (Doc. 24-2.) To attempt to make up for some of Plaintiff's lost commissions, SLWM assigned or "gifted" him new customer accounts, but Plaintiff's commissions continued to underperform prior years' earnings.[4]

After the 2025 Commission Plan was implemented by SLWM, Plaintiff continued to work for SLWM for a year until his resignation on April 28, 2026, (Doc. 8 at ¶ 8), which is the same day he filed a lawsuit against SLWM in this Court, (Doc. 1). Plaintiff testified at the preliminary injunction hearing that he continued to work at SWLM after signing the 2025 Agreement and after SLWM implemented the 2025 Commission Plan to attempt to resolve existing "commission discrepancies" on his James Hardie account and to try to recover any reduction in earned commissions after the 2025 Commission Plan by working on reassigned accounts and to work

[3] Plaintiff explained at the preliminary injunction hearing that after the Plan B structure was "sunset" by the 2025 Commission Plan, salespersons were compensated either by earned commissions only or salary. (Doc. 37 at Tr. 129:3-24.)

[4] Plaintiff alleged that these "gifted" accounts had either already terminated their relationships with SLWM at the time he was assigned to them, or that their sales were otherwise minimal. (Doc. 24 at ¶ 15.)

with SWLM "to find ideas that would drive sales and potentially increase commissions." (Doc. 37 at Tr. 23:23-24:13.)[5]

Plaintiff asserts nine claims against SLWM seeking damages, recission of the 2025 Agreement, declaratory relief and injunctive relief as to the 2025 Agreement, among other remedies, as follows:

| Count | Claim |
|---|---|
| 1 | fraudulent inducement claim (2025 Employment Agreement) |
| 2 | declaratory judgment that the restrictive covenants in the 2025 Employment Agreement are unenforceable due to SLWM's prior material breach |
| 3 | declaratory judgment that the restrictive covenants in the 2025 Employment Agreement are unenforceable and impermissibly broad |
| 4 | Missouri Sales Representative Commission Act, § 407.911, RSMo, *et seq.* claim |
| 5 | breach of contract (2024 Agreement A Plan) |
| 6 | breach of contract (Webb-Mason Employment Agreement) |
| 7 | breach of contract (2024 Agreement A Plan) |
| 8 | unjust enrichment (in the alternative) |
| 9 | breach of the duty of good faith and fair dealing |

On June 8, 2026, Plaintiff filed the instant motion for preliminary injunction to enjoin SLWM from enforcing the restrictive covenants in the 2025 Agreement against Plaintiff during the pendency of this action. Further facts are set forth below as necessary.

[5] As indicated above, Plaintiff testified that none of these things ultimately proved successful and that he was unable to get sufficient information or details regarding the James Hardie account to reconcile the owed-commissions issue, that several of the accounts that were reassigned had either terminated their relationship with SLWM or were in arrears with no real commissions to be earned, and that discussions with Mr. Sherlock were either not fruitful or were not made available. (*See* Doc. 37 at Tr. 24:10-26:2.)

## Legal Standard

The Eighth Circuit considers motions for preliminary injunctions based on the following factors: (1) the threat of irreparable harm to the plaintiff, (2) the state of balance between such harm and the injury that granting the injunction will inflict on other parties, (3) the probability the plaintiff will succeed on the merits, and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "[T]he absence of irreparable harm 'is an independently sufficient ground upon which to deny a preliminary injunction.'" *Morehouse Enters., LLC v. BATFE*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quoting *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016)); *id.* at 1018 ("Given a lack of irreparable harm, we conclude the district court did not abuse its discretion in denying the preliminary injunction."); *see also Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667 (8th Cir. 2022). "The movant bears the burden of demonstrating the preliminary injunction is warranted because a preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Morehouse Enters., LLC*, 78 F.4th at 1016 (quoting *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022)).

## Discussion

Plaintiff seeks a preliminary injunction against SLWM (1) enjoining SLWM from "enforcing or threating to enforce the restrictive covenants contained in the 2025 Agreement," (2) enjoining SLWM "from initiating any legal proceedings against Plaintiff or third parties based on the restrictive covenants," and (3) ordering SLWM "to notify any third parties to whom it has communicated its intent to enforce the 2025 Agreement's restrictive covenants that such enforcement has been enjoined." (Doc. 6 at 4.) SLWM argues that Plaintiff is not entitled to preliminary injunction because he has not shown a likelihood of success on the merits or a sufficient threat of irreparable harm. Given that the failure to demonstrate a threat of irreparable harm alone is sufficient to deny Plaintiff's request for a preliminary injunction, the Court considers that factor first. *See Allied Servs., LLC v. Smash My Trash, LLC*, No. 21-cv-00249-SRB, 2021 WL 1671675, at *3 (W.D. Mo. Apr. 28, 2021).

### I. Irreparable Harm

Plaintiff argues that he faces a threat of irreparable harm from the enforcement of the restrictive covenants because of: (1) the inability to work in his only field of expertise for two years while nearing retirement age; (2) potential bankruptcy; (3) credit score impacts; (4) inability to pay for health insurance and medical care; (5) inability to care for an ailing father;

(6) unquantifiable lost business opportunities; and (7) the loss of business relationships and professional reputation.[6] (Doc. 39 at 17-18.)

SLWM argues that Plaintiff's claim that he is unable to work in the promotional sales field is inaccurate, that Plaintiff otherwise has an adequate remedy at law through monetary damages for any economic harms or lost business opportunity, and that Plaintiff's loss-of-reputation allegations are conclusory and unsupported. Ultimately, the "burden [is] on [the movant] to establish the threat of irreparable injury." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). In doing so, the movant must show he has "no adequate remedy at law because [his] injuries [could not] be fully compensated through an award of damages." *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2018) (internal quotation marks omitted). To establish irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).

### A. Inability to Work in Promotional Sales Industry for Two Years

Plaintiff claims that the restrictive covenants in the 2025 Agreement bar him from working in the promotional products sales industry, the only field in which he has expertise, at the cusp of his retirement. In so arguing, Plaintiff construes the restrictive covenants as a 2-year, nationwide, non-competition agreement which bars him from working for all potential promotional sales product customers, suppliers, and vendors. (Doc. 36 at 17.)

However, the 2025 Agreement's restrictive covenants are not as broad as Plaintiff suggests, at least on their face. "[I]n Missouri, the interpretation of a written contract is a matter of law for the court."[7] *CitiMortgage, Inc. v. Platinum Home Mortg., Corp.*, 915 F.3d 501, 506 (8th Cir. 2019) (internal quotation marks omitted). Thus, the Court need not adopt Plaintiff's construction of the non-competition and non-solicitation provisions. Section 2(a) prohibits Plaintiff from engaging in any business with current customers or customers who have done business with SLWM in the 12 months prior to the Restricted Period. (Doc. 8-3 at 3-4.) Thus, the non-competition provision in

---

[6] Plaintiff's list of irreparable harms has shifted and grown since the filing of the preliminary injunction motion. This list is taken from Plaintiff's "Closing Argument" brief submitted to the Court after the preliminary injunction hearing. That list contains eight separately numbered harms; here, the Court has combined "inability to pivot to a new field at age 61 where he is the sole provider for his family" and "loss (forced retirement) or damage to his 39-year career in his only field of expertise by being sidelined for 2 years." (Doc. 39 at 17.) The forthcoming analysis is the same as to both harms.

[7] The parties appear to agree that Missouri law applies in this case.

§ 2(a) prohibits a broad range of conduct as to current and recent customers of SLWM. Section 2(b), on the other hand, prohibits solicitation of "any present or prospective customers, suppliers or other business relations of the Company to terminate, adversely modify, or reduce their relationship with the Company." (*Id.* at 4.) Thus, the non-solicitation provision in § 2(b) prohibits a narrow range of conduct (soliciting to terminate, adversely modify, or reduce relationship with SLWM) as to a broad range of third parties in the industry.

Neither § 2(a) nor § 2(b), individually or in combination, facially prohibit Plaintiff from working in the promotional products sales industry for a competitor of SLWM, so long as Plaintiff does not provide services to a current or past 12-months SLWM client (which would violate § 2(a)) or solicit clients, potential clients, or suppliers to adversely modify their relationships with SLWM (which would violate § 2(b)). Plaintiff's construction of the restrictive covenants conflates these two provisions to claim that he cannot conduct *any business* with any current, former, or prospective clients; suppliers; or other business relationships of SLWM. At most, that is only true of SLWM's current and recent customers under § 2(a). To this point, however, Plaintiff offers no *evidence* that the *practical* effect of the restrictive covenants is to completely bar him from working in the promotional products sales industry.

For example, there is no indication in the record that SLWM's client base is so large that Plaintiff would likely be unable to work for any competitors because the client lists overlap to such a degree that Plaintiff's restrictive covenants would always be implicated for every potential "customer" (or at least a large swath of potential customers) seeking to buy branded promotional products.[8] There is also no evidence in the record that Plaintiff has attempted to apply to any competitor or determine whether there are competitors who do not service any SLWM clients.[9] From the record, it appears that Plaintiff took the stance that his restrictive covenants would not

[8] It appears to the Court that Plaintiff's claim of irreparable harm here boils down to the simple fact that under the restrictive covenants (and particularly § 2(a)) Plaintiff is prohibited, by the plain language, from selling promotional products to the clients with whom he has had a long-standing relationship and who may have even followed Plaintiff from Resource Print Management to Webb-Mason and then to SLWM with Supply Logic's subsequent acquisition of Webb-Mason. Irreparable harm requires something more in the restrictive-covenant context.

[9] The Court is also not persuaded by Plaintiff's claim that he can only work in the promotional products sales industry due to his experience. Plaintiff has not demonstrated why his expertise and skills are not transferrable, for example, to a sales job in a different industry. Nevertheless, it is sufficient here that Plaintiff does not present evidence beyond a generalized and conclusory assertion that the restrictive covenants would prohibit him from working in the industry of promotional product sales altogether.

permit him to work for a competitor (despite no language to that effect), and thus he has not attempted to gain employment in the promotional products sales industry since resigning from SLWM.

Plaintiff relies on *Bryant v. Nationwide Anesthesia Services, Inc.*, No. 8:21-cv-335, 2021 WL 3912264 (D. Neb. Sept. 1, 2021), in support of his argument that he will suffer irreparable harm if the restrictive covenants are not enjoined because he cannot work in his field of expertise. In that case, the court concluded that Bryant showed irreparable harm due to her "complete inability to obtain employment in the entire field of her expertise." *Id.* at *5. However, the restrictive covenants in *Bryant* were broader than those at issue here, and barred Bryant from owning a company or working for a company that "competes with the business" or "in any way provides . . . services similar to those provided by the" business for two years across the United States.[10] *Id.* at *1. Thus, the provisions at issue in Bryant truly restricted her ability to work in her field of expertise across the country for two years. Here, Plaintiff is barred only from competing for current and recent clients. It appears that he is otherwise able to work in the industry so long as he does not solicit parties to adversely affect their relationships with SLWM. And again, Plaintiff has not provided any evidence that the effect of the restrictive covenant, particularly § 2(a), is so large that it effectively prohibits work in the entire promotional product sales industry.

This case is more like *Beber v. NavSav Holdings, LLC*, 140 F.4th 453 (8th Cir. 2025), in which the lower court and 8th Circuit agreed that "economic injuries" from "loss of income, impairment of their ability to earn a living, and the costs of litigation" were not irreparable harms.[11] *Id.* at 461.[12] In *Beber*, the restrictive covenants prevented employment with any business in competition with the employer for one year for a five-mile radius and prohibited solicitation of

---

[10] In *Bryant* the former employer was a "staffing firm for businesses with anesthesia-staffing needs," where Bryant worked as a recruiter and services provider. 2021 WL 3912264, at *1.

[11] The Eighth Circuit reversed the district court on other grounds in *Beber*. The district court had concluded that, despite the lack of irreparable harm on the plaintiffs' economic harms, the absence of an injunction would irreparably harm Nebraska's public policy against overbroad restrictive covenants in employment contracts. The Eighth Circuit reversed, finding that the irreparable harm analysis must be conducted as to the plaintiffs, not some third party. *Beber*, 140 F.4th at 463 ("Considering potential harm to Nebraska public policy conflates the irreparable-harm factor and the public-interest factor.").

[12] "Loss of income and the inability to make a living are quintessential pocketbook injuries that money damages can remedy." *Brennan v. Boston Beer Co., Inc.*, No. 24-10029-GAO, 2025 WL 50365, at *2 (D. Mass. Jan. 8, 2025) (citing *Together Emps. v. Mass. Gen. Brigham Inc.*, 32 F. 4th 82, 86 (1st Cir. 2022)).

any customer of the employer for three years. *See Beber v. NavSav Holdings*, LLC, No. 8:23-cv-323, 2023 WL 5412612, at *2-3 (D. Neb. Aug. 22, 2023). Based on the restrictive covenants at issue, the district court concluded that the "impairment or elimination of their ability to earn a living and support their families and themselves" was not irreparable harm. *Id.* at *19. The district court distinguished *Bryant* and concluded that the provisions at issue in *Beber* would not make the plaintiffs unable to seek further employment in their specialized area (presumably because of the limited 5-mile radius). *Id.* at *56. In short, the Court finds that Plaintiff's conclusory allegations that the restrictive covenants wholly bar him from working in the promotional products industry and the associated economic injury alleged to arise from the covenants do not satisfy his burden to demonstrate a likelihood of irreparable harm.[13]

**B. Potential Bankruptcy, Adverse Credit Score Impacts, Inability to Pay for Health Insurance and Health Care, and Inability to Care for Ailing Parent**

Plaintiff further alleges that, as a result of being unable to work in the promotional products sales industry, he is likely to face irreparable harm from potential bankruptcy, adverse credit score impacts, inability to pay for health insurance and healthcare, and inability to care for an ailing parent. These alleged irreparable harms fail for the same reason discussed above. Specifically, Plaintiff has not shown that the restrictive covenants completely bar him from working in the promotional products sales industry. Thus, any harms arising from Plaintiff's continued unemployment are not a result of the restrictive covenants and would not be redressed by an injunction.

Moreover, even if Plaintiff were barred from employment in the industry, these alleged harms are economic in nature and may be redressed with damages. Courts have rejected the argument that a potential bankruptcy establishes irreparable harm. See *Cap. Credit Alliance v. Nat'l Automated Clearing House Ass'n*, No. 207CV01683KJDLRL, 2008 WL 11449299, at *5 (D. Nev. Jan. 30, 2008) (". . . [P]laintiffs have failed to demonstrate that they will suffer beyond financial harm or hardship. . . .") (rejecting argument that potential bankruptcy is irreparable harm). Additionally, "courts routinely conclude[] that harm to a party's credit score does not amount to

[13] Plaintiff's emphasis that he is "approaching retirement age," (Doc. 39 at 18), and that the restrictive covenants "effectively force an early retirement," (Doc. 7 at 16), is an unpersuasive re-packaging of his argument for irreparable harm by being precluded from work in the whole promotional products industry. Plaintiff cites no caselaw addressing similar irreparable harm for a plaintiff-employee in nearing-retirement-age circumstances to show irreparable harm.

irreparable damage." *City of Painesville v. Browning-Ferris Indus. of Ohio, Inc.*, No. 1:26-cv-1433, 2026 WL 2056022, at *5 (N.D. Ohio July 16, 2026) (finding "potential harm to a resident's credit score would be compensable through monetary damages") (collecting cases); *see also Silva v. Volkswagen Grp. of Am., Inc.*, No. 24-06367-MWF, 2025 WL 819076, at *2 (C.D. Cal.) ("Harms to Plaintiff's credit score and finances more broadly are fundamentally economic harms, unsuitable for a temporary restraining order."). Finally, Plaintiff has shown that he was able to obtain other health insurance. (Doc. 8 at ¶ 63 ("My family and I have obtained insurance through COBRA, which is 3x the cost of what I had been paying for insurance.").) If Plaintiff becomes unable to pay for that health insurance, "[i]nsofar as his 'ability to pay for COBRA stem[s] from [his] loss of salary,' not '[h]is complete inability to secure alternative medical benefits,' plaintiff pleads ordinary legal harm." *Tyson-Phipps v. Rubio*, No. 23 CIV. 2316 (LAK) (GWG), 2026 WL 859636, at *5 (S.D.N.Y. Mar. 30, 2026), *report and recommendation adopted*, No. 23-CV-2316 (LAK) (GWG), 2026 WL 1082560 (S.D.N.Y. Apr. 21, 2026) (rejecting argument that inability to pay for health insurance due to loss of salary is irreparable harm); *see also Burnell v. Lewis Brisbois Bisgaard & Smith LLP*, No. C22-0265-JLR, 2023 WL 7110485, at *3 (W.D. Wash. Oct. 27, 2023) ("[C]ases considering the issue conclude that the loss of employer-provided health insurance does not constitute 'irreparable harm.'").

Plaintiff has not cited, and the Court has not found, any case which categorizes the inability to care for a family member as an irreparable harm. Moreover, Plaintiff's testimony on this point is speculative at best, with Plaintiff stating if he is unable to work for two years he would "*probably* no longer be able to be [his father's] primary caregiver," without providing further detail. (Doc. 37 at 27:12-13 (emphasis added).) *See Iowa Utils. Bd.*, 109 F.3d at 425 ("[A] party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.").[14]

[14] Plaintiff's declaration fares no better, stating only that "[n]ot having income is straining my ability to place my faither in an appropriate facility to manage his care," without further details or showing that Plaintiff will likely not be able to care for his father in the imminent future. (Doc. 8 at 65.) And, again, the Court has found that the premise of this alleged harm—Plaintiff's claim that he cannot work in the promotional products sales industry—is not supported by the plain text of the 2025 Agreement's restrictive covenants.

### C. Lost Business Opportunities and Profits

Next, Plaintiff argues that he will suffer irreparable harm through unquantifiable lost customer sales opportunities. Plaintiff identifies three SLWM customers who have contacted him since his resignation from SLWM on April 28, 2026—Heart to Heart, Populus, and Wyndham.[15] (Doc. 24 at ¶ 46.) Plaintiff further states that he told those customers that he cannot speak to them at this time, and he did not pursue business with these customers because of the threat of enforcement of the restrictive covenants in the 2025 Agreement. (*Id.*) Plaintiff argues that this harm is irreparable because the "scale of the lost business is unknown" and "he avoided other likely customers." (Doc. 23 at 9; Doc. 24 at ¶¶ 47-50.)

Plaintiff's claim of lost clients and sales due to the enforcement of the restrictive covenants would likely manifest as lost contracts for sales of promotional products, which are quantifiable through monetary damages. *See Digit. Monitoring Prods., Inc. v. Hall*, No. 23-03328-CV-S-BP, 2023 WL 11841028, at *5 (W.D. Mo. Dec. 11, 2023) (holding lack of irreparable harm despite non-competition provision where "Plaintiff's claim of lost client relationships would likely be manifested in—and could be quantified through—lost sales"). Plaintiff testified that customers he turns away will not wait two years for their print and promotional products and that they will likely go to another sales provider. (Doc. 24 at ¶ 50; Doc. 37 at 35:1-9.) He also agreed that there will be records of what orders those clients placed with other sales companies. (Doc. 37 at 35:1-9.) While the profit margins may differ between the ultimate sales provider and what Plaintiff would have made, this is not dispositive proof that the lost sales are incalculable. *See Gen. Motors Corp.*, 563 F.3d at 319 (affirming district court finding that plaintiff lacked irreparable harm because the "claim of lost customer relationships was equivalent to a claim of lost profits" which "was quantifiable and could therefore be compensated").

SLWM argues that a potential difference in profit margin is an input for a damages expert, rather than proof of incalculability. The Court agrees. Where information regarding potential lost profits can be gained from "evidence developed at summary judgment or after a trial on the

---

[15] While Plaintiff argues in the reply brief that these customers were his prior to SLWM acquiring Webb-Mason, SLWM bought Webb-Mason's client book and assumed the obligations and rights under Webb-Mason's contracts. Plaintiff then admitted at the hearing that all the customers that have reached out to him since he resigned were customers of SLWM. (Doc. 37 at 33:20-34:1.) Thus, Plaintiff's argument is not persuasive to the extent he relies on having relationships with these customers prior to SLWM's acquisition of Webb-Mason.

merits," the finder of fact "can determine or reliably estimate" the loss in damages. *See Choreo, LLC v. Lors*, 164 F.4th 667, 671 (8th Cir. 2026) (finding lost fees calculable because there was a fee table in the record and other evidence could be developed during litigation). Here, there are historical sales records for the customers at issue, any future contracts for promotional goods with other sales providers will be discoverable, and Plaintiff has not shown that calculations accounting for different profit margins are unfeasible. Plaintiff also agreed that there is about eight and a half million dollars' worth of business that he is seeking to compete with SLWM for if a preliminary injunction is issued prohibiting SLWM from enforcing the restrictive covenants. (Doc. 37 at 36:13-25.)

Moreover, lost clients can be identified in this case. *See Guy Carpenter & Co. v. John B. Collins Assocs.*, 179 F. App'x 982, 983 (8th Cir. 2006) (affirming denial of preliminary injunction for lack of irreparable harm despite non-competition provision where "damages are an adequate remedy for any breach because clients who leave [moving party] can be identified and the damages resulting from the loss of those clients can be calculated"). Plaintiff has already provided three such "lost clients." And the broader set of potential lost clients (i.e., current and 12-month trailing SLWM clients) is readily available to SLWM and discoverable by Plaintiff during the course of this litigation. The Court thus finds that Plaintiff has not presented enough evidence to establish that the risk of irreparable harm is so "certain and great and of such imminence" as to require preliminary injunctive relief. Nor is there evidence that Plaintiff's alleged lost client harms are truly irreparable because (1) the clients Plaintiff alleges he cannot work for are readily identifiable, and (2) the damages resulting from the loss of such clients is calculable. *See also GreatAm. Leasing Corp. v. Dolan*, No. 10-4631 (JRT/JJK), 2011 WL 334829, at *3 (D. Minn. Jan. 31, 2011) (concluding moving party failed to show irreparable harm despite non-competition provision where "any customers lost can be identified and the amount of business gained from those customers can be quantified").[16]

**D. Loss of Business Relationships and Professional Reputation/Goodwill**

Distinct from the harm of lost sales and profits, Plaintiff argues that he faces a threat of irreparable harm from loss of business relationships and injury to his professional reputation. The

[16] To the extent Plaintiff argues that he cannot identify each lost customer because some may not reach out to him at all due to the restrictive covenants, any such loss is highly speculative and insufficient to establish irreparable harm.

"[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. v. AdvancePCS*, 316 F.3d 733, 741 (8th Cir. 2003). As the Eighth Circuit has explained:

> [i]t [is] acceptable for a district court to find a likelihood of irreparable harm based on general principles, but it does not mean that it is error for the district court to require additional evidence in other cases. Part of the district court's discretion is assessing whether an alleged harm requires more substantial proof.

*Digit. Monitoring Prods., Inc.*, 2023 WL 11841028, at *5 (quoting *Gen. Motors Corp.*, 563 F.3d at 320). In other words, it is within the district court's discretion to consider the particular facts before the court in determining whether the threat of irreparable harm exists, rather than only applying the general principle that the loss of reputation or goodwill constitutes irreparable harm. For example, in *General Motors Corp.*, the Eighth Circuit recognized the general principle that the loss of consumer goodwill can establish irreparable harm, but it concluded the district court properly exercised its discretion in considering the facts of the case and finding that General Motor's "claim of lost customer relationships was equivalent to a claim of lost profits," and thus did not establish irreparable harm." *Gen. Motors Corp.*, 563 F.3d at 319.

Here, as discussed above, the harm to customer relationships Plaintiff alleges can be construed as a claim of lost business opportunities and profits, which are calculable as money damages. Moreover, the Court finds that Plaintiff's claims as to loss of reputation and goodwill are speculative. "[S]peculative harm does not support a preliminary injunction." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (finding "MPAY's uncorroborated claim that these harms [to goodwill and reputation] are inevitable does not satisfy MPAY's burden to show irreparable harm."). Plaintiff declares that "my goodwill and relationships with these customers is being damaged" without any further explanation or evidence that such damage to his reputation has occurred or is likely to occur.[17] (Doc. 24 at ¶ 50.) *See Watkins Inc. v. Lewis*, 346 F.3d 841, 846 (8th Cir. 2003) (upholding district court finding of no irreparable harm from loss of customer relationships and goodwill where the claimed harms were "described in such general terms that the district court was unable to assess whether the Lewises

[17] Apart from Plaintiff's conclusory claims in his declarations, the only evidence in the record that he appears to cite in support of the loss of reputation or goodwill is a NewsRoom article reporting Plaintiff's filing of the instant lawsuit against SLWM. (Doc. 24-1.) The Court is not persuaded that coverage of the lawsuit Plaintiff filed can establish that SLWM's enforcement of the restrictive covenants is damaging Plaintiff's reputation.

were being irreparably harmed.");[18] *see also Rev. Mgmt. Sols., LLC v. Commerce Bank*, No. 25-3159, __ F.4th __, 2026 WL 2121783, at *3 (8th Cir. July 23, 2026) (finding district court did not clearly err in finding RMS's potential reputational harms too speculative where RMS's brand was not visible to users of Commerce's platform, and thus attribution to RMS of any shortcomings of the platform would be speculative).[19]

Ultimately, the "burden [is] on [the movant] to establish the threat of irreparable injury." *Gen. Motors Corp.*, 563 F.3d at 319. On the record before the Court, Plaintiff has not established a sufficient threat of irreparable harm to goodwill or business reputation. Thus, the Court concludes that Plaintiff has failed to establish a sufficient threat of irreparable harm as to any of the alleged harms. "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction . . . ." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). "Once a court determines that the movant has failed to show irreparable harm absent an injunction, the inquiry is finished and the denial of the injunctive request is warranted." *Id.* at 420.

[remainder of page intentionally left blank]

---

[18] In *Watkins*, the customers the Lewises were claiming it could not sell to were "described in such general terms" that the district court could not assess the claim of harm. *Id.* at 846. Here, Plaintiff has sufficiently described three customers; however, he has only generally described any potential loss of reputation or goodwill.

[19] As a practical matter, it is unclear how Plaintiff complying with the terms of the restrictive covenants he entered damages his professional reputation in the eyes of potential customers. Presumably, compliance with contractual obligations would improve one's reputation. Moreover, restrictive covenants are common in the industry such that customers and suppliers would understand the limitations placed on salespersons upon leaving a particular place of employment. (*See* Doc. 37 at 85:8-13 (Plaintiff testifying that Webb-Mason also had restrictive covenants and the idea of restrictive covenants in the industry was not new to him).)

## II. Other Preliminary Injunction Factors

Because Plaintiff "has not met [his] heavy burden of demonstrating the threat of irreparable harm with respect to its alleged loss of goodwill, reputation or customers," or any other categories of alleged harm, the Court need not consider the remaining *Dataphase* factors of likelihood of success on the merits,[20] balance of harms, and public interest. *See Allied Servs.*, 2021 WL 1671675, at *5 (denying preliminary injunction after finding no threat of irreparable harm, without analyzing the remaining *Dataphase* factors).

**Conclusion**

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that Plaintiff's motion for preliminary injunction, (Doc. 6), is **DENIED**.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: August 21, 2026

[20] In moving for preliminary injunction, Plaintiff only attempts to demonstrate likelihood of success on the merits of his fraudulent inducement (Count 1) and declaratory judgment claims (Counts 2 and 3) concerning the 2025 Agreement. A central issue to these claims moving forward—to the extent Plaintiff seeks recission and/or declaratory relief as to the 2025 Agreement and specifically the non-compete and non-solicitation provisions—will be the effect of Plaintiff's continued employment for a year after the 2025 Commission Plan was subsequently implemented, allegedly decreasing his commissions by approximately 40%. Generally, "a victim of fraud has the option of rescinding the contract or affirming the contract and suing for damages, but he cannot do both." *Silver Dollar City v. Kitsmiller Constr. Co.*, 931 S.W.2d 909, 917 n.16 (Mo. Ct. App. 1996). However, as discussed above, the Court need not and does not resolve this merits-facing issue at this stage given the finding that Plaintiff has not shown a threat of irreparable harm.